## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VNUE, INC.,<br><br>                              Plaintiff,<br><br>        v.<br><br>LG CAPITAL FUNDING, LLC, JOSEPH LERMAN, BORUCH GREENBERG, and DANIEL GELLMAN,<br><br>                              Defendants. | **CIVIL ACTION NO. _____**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff VNUE, Inc., through counsel, states for its Complaint against Defendants LG Capital Funding, LLC, Joseph Lerman, Boruch Greenberg, and Daniel Gellman[1] as follows.

## NATURE OF THE ACTION

1.      LG is a "death spiral" or "toxic" lender,[2] an unregistered securities dealer that engages in convertible market adjustable securities transactions with small public companies—businesses that are often struggling to raise capital.  Toxic lenders like LG are not the saviors of microcaps that they purport to be, nor is their business model legal; they are unregistered dealers and, often, as in this case, criminal usurers.

2.      LG's business model is illegal and unlawful under both state usury statutes[3] as well as federal securities laws[4] by contracting to purchase convertible notes, a security, that

---

[1]  The following terms are used herein:  VNUE, Inc. ("Plaintiff" or "VNUE"); Defendant LG Capital Funding, LLC ("Defendant" or "LG"); Defendant Joseph Lerman ("Lerman"); Defendant Boruch Greenberg ("Greenberg"); and Daniel Gellman ("Gellman"); Lerman, Greenberg, and Gellman, collectively, the "LG Managers;" and all Defendants, collectively, the "Defendants."

[2]  *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (last accessed April 11, 2022); https://en.wikipedia.org/wiki/Death_spiral_financing (last accessed April 11, 2022).

[3]  *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612 (N.Y. 2021).

[4]  On June 7, 2022, the SEC filed a lawsuit against LG in this Court for violations of Section 15(a) under the Securities Exchange Act of 1934.  *See SEC v LG Capital Funding LLC*, No. 1:22-cv-03353 (S.D.N.Y. Jun. 7, 2022).

charge small public companies criminally usurious rates of interest through hidden interest charges.

3.　　LG is operating as a securities dealer but is not registered as such with the Securities and Exchange Commission ("SEC").  As reflected in recent SEC prosecutions,[5] lenders like LG avoid registration so they can evade regulatory oversight, using a business model that not only violates dealer-profit rules, but  also constitutes a business of predatory lending that charges more than twice the permissible rate of interest under New York.

4.　　LG's business model is simple: unlike an investor or trader, LG uses the loan transaction to acquire the company's stock at a steep discount[6] (in addition to formal loan interest), which it then dumps into the public markets as soon as possible in order to reap the spread between the discount and the market price. Invariably, this causes a catastrophic plunge in stock price.

5.　　LG's business model is illegal.  In recent civil actions, the SEC has sued toxic lenders that use LG's precise business model for unlawfully operating as unregistered securities dealers in violation of § 15(a) of the Securities Exchange Act of 1934 (the "Act") (15 U.S.C. § 78o).  Every court to address this issue has agreed with the SEC.[7] The SEC has recently commenced an enforcement action against LG and its control persons for the exact violation claimed herein.

---

[5]　See, e.g., SEC v. Almagarby, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); SEC v. Keener, No. 20-cv-21254, 2022 U.S. Dist. LEXIS 11692 (S.D. Fla. Jan. 21, 2022); SEC v. Fierro, No. 20-2104, 2020 U.S. Dist. LEXIS 238936 (D.N.J. Dec. 18, 2020).

[6]　The stock is generally obtained via one or more market-adjustable convertible debt products required by the lender for making the loan; this may be the convertible promissory note itself or a warrant.

[7]　See, e.g., SEC v. Big Apple Consulting USA, Inc., 783 F.3d 786 (11th Cir. 2015); SEC v. Almagarby, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); SEC v. Keener, No. 20-cv-21254 (S.D. Fla. Jan. 21., 2022); SEC v. Fierro, No. 20-2104, U.S. Dist. LEXIS 238936 (D.N.J. Dec. 18, 2020); SEC v. River N. Equity LLC, 415 F. Supp. 3d 853 (N.D. Ill. 2019); SEC v. Fife, 2021 U.S. Dist. LEXIS 242126 (N.D. Ill. Dec. 20, 2021) (the "SEC cases").  For private civil actions seeking rescission based on failure to register, see Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy, 6 F.4th 50 (1st Cir. 2021), and Auctus Fund, LLC v. Players Network, Inc., 20-cv-10766 (D. Mass. Dec. 10, 2021).

6.     As with recent SEC prosecutions, the Agreements in this case[8] are unlawful as they were made and required to be performed in violation of Section 15(a) of the Act. Plaintiff seeks rescission of the Agreements, rescissionary damages equal to the gross proceeds Defendants received from the sale of Plaintiff's stock (less the amounts advanced by Defendants to Plaintiff), attorneys' fees, and any and all other relief that the Court deems just, proper, and in the interest of justice.

7.     LG is an "enterprise" under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962, *et seq.,* which engages in the collection of unlawful debts at the direction and control of the LG Managers.

8.     The loans created pursuant to the Agreements (the "Loans") are criminally usurious because they reserved and imposed charges in excess of the maximum enforceable rate of interest—25% per annum—allowed by New York state law.  *See* N.Y. Penal Law § 190.40.

9.      The Agreements charged a stated interest rate of 8% per annum and gave LG a 42% discount at conversion, resulting in a **total annual interest rate of more than double the legal 25% rate permitted under New York usury law**.

10.     LG collected from VNUE full repayment of the loan plus usurious interest, which was unlawful under New York law.

11.     Accordingly, among other relief, VNUE is entitled to treble damages under RICO because the amount of interest charged by LG is more than double the maximum enforceable rate of interest allowed by New York law.

12.     Further, the equitable remedy of voiding and rescinding the Agreements provided

---

[8]  "Agreements" are defined as the documents executed by Plaintiff in favor of LG.  Specifically: on October 23, 2018, LG and VNUE entered into a Convertible Promissory Note ("October 2018 Note"), under which LG purchased from VNUE a note in the amount of $52,500.00 bearing an 8% stated interest rate, and a Securities Purchase Agreement ("October 2018 SPA").  A true and correct copy of the Note and SPA are attached as **Exhibit 1**.

under § 29(b) of the Act should be effectuated by, among other things, ordering LG to return to VNUE every share of stock it acquired under the Agreements, or its cash equivalent, less the cash value of the net sum provided to VNUE for the purchase of the October 2018 Note.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Securities Act.

14.     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2).   Plaintiff is a citizen of Nevada, Defendant LG is a citizen of New York, upon information and belief Defendants Lerman, Greenberg, and Gellman are citizens of New York, and the amount in controversy exceeds $75,000.00.

15.     The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendant's principal place of business is located in this District and because a substantial part of the events giving rise to this action occurred in this District.

17.     Venue is also proper in this Court because the Agreements each expressly state that any action brought by either party concerning the transactions contemplated by the Agreements must be brought in New York state courts or in federal courts located in the State of New York.

## PARTIES

18.     Plaintiff VNUE is a Nevada corporation with its principal place of business at 104 W. 29th Street, 11th Floor, New York, New York 10001.

19. VNUE stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies—too small for the major exchanges—are traded.

20. Defendant LG is a New York limited liability company that maintains its principal place of business at 1218 Union Street, Suite 2, Brooklyn, New York 11225.

21. Defendant Lerman is a manager of LG and was the signatory to the SPA.  Upon information and belief, Lerman is a resident of the State of New York and resides at 1124 East 32nd Street, Brooklyn, NY 11210.

22. According to the FINRA Broker-Check database, Lerman has never been licensed as a broker.

23. Defendant Greenberg is a manager of LG.   Upon information and belief, Greenberg is a resident of the State of New York and resides at 2060 East 22nd Street, Brooklyn, NY 11229.

24. According to the FINRA Broker-Check database, Greenberg has never been licensed as a broker.

25. Defendant Gellman is a manager of LG.  Upon information and belief, Gellman is a resident of the State of New York and resides at 99 Overlook Road, Pomona, NY 10970.

26. According to the FINRA Broker-Check database, Gellman has never been licensed as a broker.

27. The SEC's website[9] confirms that neither "LG Capital Funding, LLC," nor Lerman, Greenberg, or Gellman were registered as a securities dealer with the SEC (or a self-regulatory organization, such as FINRA) at all relevant times herein.

---

[9]   *See* SEC.gov, *Company Information About Active Broker-Dealers, March 2007 - October 2021*, *available at* https://www.sec.gov/help/foiadocsbdfoiahtm.html.

**FACTUAL ALLEGATIONS**

I.    **LG CAPITAL FUNDING, LLC.**

28.    Through Lerman, Greenberg, and Gellman, LG exists for the purpose of lending money using the business model described herein.

29.    Upon information and belief, Lerman, Greenberg, and Gellman have authorized and directed LG to enter into numerous convertible promissory notes and other alternative securities transactions with numerous public companies subject to New York law.

30.    Upon information and belief, the interest rate LG charges in these transactions is (similar to the rate LG charged in this case) more than double the rate permitted under New York law, the collection of which results in an ongoing business of unlawful debt collection in violation of RICO, 28 U.S.C. § 1962(c).

II.    **THE LG GENERAL BUSINESS MODEL**

*The Defendants Target Financially-*
*Strapped Issuers in Need of Capital*

31.    Upon information and belief, Defendants position themselves to take advantage of issuers' vulnerable financial conditions to purchase from these issuers convertible notes with substantial conversion discounts and other terms highly favorable to Defendants.

32.    Defendants acquire stock directly from the public companies through note conversions and/or warrant exercise, as opposed to purchasing shares in the open market (i.e., like a "trader").

33.    Because the shares that Defendants obtain are newly-issued, the subsequent dumping of the shares into the market significantly increases both the amount of shares in the hands of the public and the issuers' outstanding share totals.   Selling large quantities of

newly-issued shares directly obtained from issuers is a common hallmark of a securities dealer.

34.    In addition to reaping gains from the spread between the discount and the market price, the Defendants negotiate to add consideration such as up-front stock, stock purchase warrants, and compensation for fees and costs.

*The Defendants Purchase Convertible*
*Promissory Notes with Favorable Terms*
*For the Purpose of Obtaining Shares of Stock*

35.    Upon information and belief, all of the stock Defendants sold as part of their business was obtained directly from the issuer through note conversions as opposed to purchases of stock in the open market.

36.    The Stock Purchase Agreements (SPA"s) used by defendants in their transactions contracturally required the defendants to purchase securities.

37.    The billions of shares that Defendants acquired through their transactions with public companies were newly-issued, and their later sales of those shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals.  Selling into the public market large quantities of newly-issued shares obtained directly from issuers is a common hallmark of a securities dealer.

38.    In addition to profiting from the spread made available by the conversion discount (and Defendants' prompt sales following a conversion) the Defendants add to their financial gains through additional negotiated terms, such as charging fees for negotiation, preparation, execution, delivery and performance of the Agreement.  *See, **Exhibit 1**, October 2018 SPA at § 4a.

***Defendants Converted Promissory***
***Note Debt Into Newly Issued Shares of***
***Common Stock  at a Substantial Discount***

39.     The Defendants' business model exploits the tacking provision of the Rule 144[10] exemption for unregistered stock by holding only the convertible promissory notes (which are payable absolutely) for the six-month holding period, thereby avoiding investment risk.  Upon conversion, Defendants obtain freely-trading stock without ever having to assume any economic risks of stock ownership.  Instead, they immediately sell the stock to reap the spread between the discount and the market price.  The value of the conversion discount is considered interest under New York law.

40.     Upon information and belief, Defendants time their conversions and sales in an effort to comply with the holding period under Rule 144.  For that reason, Defendants generally wait either six months (the minimum Rule 144 holding period for securities issued by SEC-reporting companies) or one year (the minimum Rule 144 holding period for securities issued by non-SEC-reporting companies) after purchasing a convertible note, before they began to convert the notes into newly-issued stock and then sell that stock into the public market.

41.     The convertible notes that Defendants purchased and/or solicited from public companies have allowed defendants to acquire no fewer than **13,427,658,440 shares** of newly-issued stock at a substantial discount—typically 45-60 percent below the lowest trading price for the issuer's common stock during a "valuation period" preceding the date of the

---

[10]  SEC Rule 144, was adopted to establish criteria for determining whether a person was engaged in the distribution of securities.  One condition under Rule 144 is that the selling security holder must have held the security for a specified period of time (six months in this case) prior to resale into the market. This condition helps ensure that the holder who claims an exemption has assumed the full economic risks of ownership, and is therefore not acting as an underwriter.  Rule 144 also permits "tacking" of the six-month holding period; if a security holder simply exchanges a previously-purchased security for a different security of the same issuer (such as with conversion), the newly-acquired security is deemed to have the same purchase date as the original security.  If the holding period has expired, the new security may be sold immediately.

conversion request.

42. After holding the convertible debt acquired through convertible note transactions for the applicable holding period required by Rule 144, Defendants send conversion notices to the issuers and their transfer agents, identifying the amount to be converted and the corresponding shares to be issued to Defendants.

43. Typically, instead of converting all of the debt into stock all at once, Defendants usually utilize multiple conversion notices for each convertible note. Upon information and belief, among other reasons, Defendants incrementally convert debt into stock and sell said stock over a period of time to purposefully avoid owning more than five percent of any class of an issuer's publicly traded stock at any one time. Far from an investment strategy, such incremental conversions and sales are timed for the purpose of evading the requirement to file a "beneficial ownership report" with the SEC (*i.e.*, Schedule 13D and Schedule 13G). *See* 17 CFR § 240.13d-1.

44. Once a conversion notice is submitted to the issuer or its transfer agent, Defendants arrange for the converted stock to be transferred to their brokerage accounts as quickly as possible to ensure maximum profits and to capitalize on the conversion discount, often paying expediting fees to further reduce the time for this to occur.

45. As part of their business model, Defendants obtain attorney opinion letters that, at minimum, provide false assurances to brokerage firms that the converted stock is not restricted and may be resold to the public.

### Defendants Sell the Converted
### Stock Into the Public Market

46. Upon information and belief, once brokers deposit the converted shares from the issuers into the Defendants' brokerage accounts, the Defendants generally begin selling the

shares into the public marketplace immediately to lock in their profits.

47.     Upon information and belief, the Individual Defendants personally, or through an affiliated person, entity, or independent contractor acting at their direction, use the telephone and the internet to place sell orders.  Sales are made through brokers.

48.     Upon information and belief, Defendants generally sell only as much as the market will bear, often staggering sales over a short period of time instead of all at once.

49.     Upon information and belief, Defendants' practice is to sell the shares they have acquired in a conversion continuously on a daily or near-daily basis until they have sold all of their shares into the market.

### Defendants Earn the Majority of Their Profits From
### Selling Discounted Shares of Newly-Issued Stock

50.     Upon information and belief, Defendants reap large profits from their unregistered dealer activity, the majority of which results from reaping the difference between the market prices they receive when they sell the stock to the public, and the deeply-discounted prices at which they acquire shares from the issuers, rather than from any appreciation in the stock's price. This mechanism, which provides Defendants with a spread or markup on the stock that they sell, is a common practice among securities dealers.

51.     Since 2013, Defendants have purchased numerous convertible promissory notes (securities) from multiple public companies (at least 160) and converted the same into no fewer than **13,427,658,440** shares of newly-issued stock which, upon information and belief, Defendants have subsequently sold into the public market for millions of dollars.

52.     Upon information and belief, Defendants have generated millions of dollars in gross stock sale proceeds, with many other securities transactions still outstanding.  The majority of the net profits are from the spread between Defendants' discounted purchase price (per the

terms of the applicable note) and the prevailing market pricing.

*Defendants Violate the Federal Securities*
*Laws by Engaging in Securities Transactions as Unregistered Dealers*

53.    Upon information and belief, Defendants are not now, and have never been registered as securities dealers with the Financial Industry Regulatory Authority ("FINRA").

54.    Defendants' purchases of convertible notes are transactions in securities.

55.    Defendants' conversions of debt under the convertible notes into stock are transactions in securities.

56.    Defendants' subsequent sales of the conversion stock into the public markets are transactions in securities.

57.    The securities transactions described in Paragraphs 54-56 are effectuated by Defendants as a part of its ongoing business, and are done for its own account.

58.    As part of its regular business, Defendants acquire large amounts of shares directly from public companies at a substantial discount to market, sell large volumes of shares back into the open market for a substantial profit due to the conversion discount, and do so for its own account absent investment intent.   Accordingly, Defendants buy securities, convert securities, and sell securities as part of its regular business for its own account.

59.    Defendants use mail, email, wire transfers and other instrumentalities of interstate commerce to effect the Agreements and subsequent securities transactions.   For example, Defendants transferred cash through wire transfers, and used email and telephone communications to negotiate and effect purchases and sales of securities.

60.    Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC, or, in the case of a natural person, associate with a registered dealer.

*See* 15 U.S.C. § 78o(a)(1).

61.     By failing to comply with the dealer registration requirements mandated by federal law, Defendants purposefully operate "under the radar" to avoid important legal and regulatory oversight by the SEC and FINRA.

62.     The dealer registration requirements provide important safeguards for the investing public, shareholders and public companies.  The excessive compensation and patently unfair terms in the Agreements (and upon information and belief, in Defendants' transactions with other issuers) would violate FINRA Rules 5110(b) and 5110(c)(2)(A) (and likely several others), and no securities dealer registered with the SEC would be permitted to use such terms.

63.     Defendants' outrageous profits from the Agreements result from the market prices it received when they sold the stock into the public market, and the steep discounted price at which it acquired the stock from VNUE.  This practice—through which Defendants reap the profits on the spread or markup of the stock they sold—is a common behavior of a securities dealer or underwriter.

64.     Registration as a securities dealer and accompanying SEC oversight would further prevent Defendants from utilizing the Rule 144 tacking provision (17 C.F.R. 230.144(d)(3)(ii)) because Defendants' business operations constitute underwriting activity, or sales with a view to distribution.

65.     Operating as an underwriter requires dealer registration.

66.     As a part of its regular business, Defendants contract to purchase securities, and obtain newly-issued stock directly from microcap issuers through note conversions -- as opposed to purchasing stock in the open market.

67.     The convertible securities that Defendants purchase enable it to acquire millions

of shares of newly-issued stock at a significant discount—typically about 45-60 percent of the trading price. As a regular part of its business, Defendants sell large blocks of such newly-issued shares into the public market—a common hallmark of a securities dealer.

68.     Upon information and belief, Defendants have used its business model to extract billions of shares of stock from Plaintiff and other unwitting issuers.

## III.     DEFENDANTS' BUSINESS MODEL AS APPLIED TO PLAINTIFF

### Defendants Entered Into
### Agreements That are Usurious and
### Unenforceable Under New York Law

69.     The Agreements state and require that the transaction(s) are governed by New York law.

70.     Pursuant to its typical business model, the Agreements provide LG with a conversion option, that is, an option to take repayment by exchanging the debt for shares of company stock.

71.     Consistent with its usual practice, LG would not exchange the debt on a dollar-for-dollar basis, but at a substantial discount to the market price at the time of conversion—in this case a 42% discount to the market price on the date of the conversion.

72.     The New York Court of Appeals has recently held that for securities of this type, the value conveyed by the conversion discount must be included in the interest calculation for purposes of assessing compliance with the state's usury laws.[11]

73.     With the value of the conversion discount included, the LG Agreement charged an effective interest rate of at **least 80% APR**, well in excess of the 25% maximum legal rate under New York law.

74.     Defendants intended to charge usurious interest demonstrated by, inter alia, the

---

[11]   *Adar Bays, LLC v GeneSYS ID, Inc.,* 179 N.E.3d 612, 614-15 (N.Y. 2021).

fact that Defendants collected on the loan an amount of stock valued well in excess of even the 80% rate.

75.     Defendants collected on the loan with an interest of over 80% APR, thereby engaging in the collection of an unlawful debt as defined under RICO Statute 18 U.S.C. § 1961(6).  pursuant to the October 2018 Note, the Defendants collected/charged at least **80%**[12] A.P.R. interest based on the Loan of $52,500.00.

76.     As consideration for the loan of $52,500.00, VNUE relinquished $156,256.93 worth of cash and stock in less than a year.  This is tantamount to a 197% gain for LG on an annualized basis.

77.     As demonstrated by the Agreements, and the additional transactions with other issuers alleged above—which is a part of LG's regular business—the Defendants are engaged in the business of lending money at rates that exceed New York's statutory usury limitations.

78.     Pursuant to New York's usury laws, the maximum enforceable rate for a loan to a corporation is 25% per annum.  *See* N.Y. Penal Law § 190.40.

79.     The fixed conversion discount, such as the ones provided to the Defendants in the Agreements, is interest that must be considered when calculating the true interest rate for usury analysis.[13]

80.     The Agreements reserved and imposed a stated interest rate of 8% per annum and a **42%** discount floating conversion rate, resulting in a **80% APR total interest rate**.*, **which is more than three times the maximum enforceable rate** permitted by New York's criminal usury law.

---

[12] Calculated as follows: 42/58 = .72, or 72% (Conversion Discount) + 8% A.P.R (Stated Interest) = **Total 80% A.P.R. Interest Rate.**
[13] *See Adar Bays,* 179 N.E.3d at 612 .

### *Defendants Converted the Debt into Stock Pursuant to The Agreements*

81.     In this case, between May and July of 2019, LG submitted *six separate conversions* under the Agreements whereby LG converted the entire $52,500.00 principal and $2,506.33 in interest due under the Agreements (the "Related Transactions").  Those conversions yielded LG *71,067,485* newly-issued shares of VNUE common stock, with an estimated fair market value of $156,256.93.  Hence, in return for a $52,500 loan, LG acquired $156,256.93 worth of VNUE stock, yielding gains of $101,250.60– all in less than one year.

82.     Each of the six conversions constitutes a separate securities transaction.

83.     Therefore, LG's gains from the conversions are approximately **$101,250.60**.

84.     Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144 and thereby began converting almost immediately after the expiration of the holding period as follows:

   a.  On May 2, 2019, a conversion notice was submitted requesting issuance of 15,095,529 shares for the satisfaction of $11,770.00 of debt, and $487.57 of interest;

   b.  On May 20, 2019, a conversion notice was submitted requesting issuance of 16,889,188 shares for the satisfaction of $15,930.00 of debt, and $722.74 of interest;

   c.  On June 6, 2019, a conversion notice was submitted requesting issuance of 11,044,903 shares for the satisfaction of $9,770.00 of debt, and $479.67 of interest;

   d.  On June 18, 2019, a conversion notice was submitted requesting issuance of 8,046,671 shares for the satisfaction of $5,770.00 of debt, and $297.19 of interest;

e.  On June 27, 2019, a conversion notice was submitted requesting issuance of 9,555,948 shares for the satisfaction of $5,260.00 of debt, and $282.45 of interest; and

f.  On July 22, 2019, a conversion notice was submitted requesting issuance of 10,435,246 shares for the satisfaction of $4,000.00 of debt, and $236.71 of interest.

85.  Each conversion of debt to stock identified in Paragraph 84 above constitutes an additional transaction in securities.

***Defendants Continue to Convert
and Sell Shares of Stock***

86.  Upon information and belief, Defendants continue to purchase new convertible notes, convert shares acquired in convertible debt transactions with counterparty penny stock issuers, and then sell those shares into the market.

87.  Upon information and belief, after waiting out the Rule 144 holding period, Defendants act in the same manner, converting and rapidly selling  millions of newly-issued shares into the market for substantial profit.

88.  Defendants have sold stock that did not meet any of the exceptions from the definition of a "penny stock," as defined by Section 3(a)(51) of the Act and Rule 3a51-1 under the Act.  *See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1.

***The LG Managers Control LG
In its Convertible Debt Securities Business***

89.  At all relevant times, Lerman, Greenberg, and Gellman, as LG's sole managing members and dominant shareholders, directly possessed and exercised control over LG, including the power to decide whether to enter into agreements (including the Agreements in this

case), to negotiate and approve the final deal terms, and to direct its sales of stock.

90.     Upon information and belief, Lerman, Greenberg, and Gellman negotiated the terms of the convertible notes that LG purchased from microcap companies (including VNUE), as well as any amendments to the original terms.

91.     Lerman, Greenberg, and Gellman used emails, phone calls, and wires in order to effectuate, continue, and maintain their scheme to provide the unlawful loans.

92.     Ultimately, Lerman, Greenberg, and Gellman, were and still remain as the sole persons holding the power to direct, authorize, and compel LG to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Agreements with VNUE.

93.     Lerman, Greenberg, and Gellman, were and currently are the "controlling persons" within the meaning of Section 20(a) of the Act, with the power to cause LG to engage in unlawful conduct described herein.

### *VNUE was Harmed by LG's*
### *Unlawful Debt Collections*

94.     As a result of the unlawful debt collections, VNUE and its shareholders have been injured in its business and property.

95.     As a result of the unlawful debt collections, LG has obtained tens of millions of shares of free-trading VNUE common stock to which it was not entitled nor capable of lawfully receiving.

96.     The excessive conversions and resulting issuances have forced VNUE to increase its outstanding shares, thereby massively diluting VNUE's stockholders.

97.     Once LG began converting under the Agreements in this case, its immediate and massive selling of large blocks of newly-issued shares of VNUE's common stock into the public

market caused enormous depressions in VNUE's market capitalization and stock price.

98.     As a result of these actions, VNUE has become unable to privately raise money from other entities, with other toxic lenders becoming the only reasonably available option for short-term financing, leading to more losses.

99.     As a direct and proximate result of the Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), VNUE has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

100.    All of the foregoing harm was foreseeable by LG, and was directly and proximately caused by LG's collections of unlawful debts as alleged herein.

## CAUSES OF ACTION

### COUNT I:

*Rescission of the Agreements Pursuant to § 29(b) of the Act, On the Ground that LG Violated § 15(a) of the Act By Entering Into the Securities Contracts as an Unregistered Dealer*
(Against Defendant LG)

101.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1 through 100 as though set forth herein.

102.    Section 29(b) of the Act provides in relevant part that:

*Every contract <u>made in violation</u> of any provision of this chapter or of any rule or regulation thereunder ... shall be void* (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or  … engaged in the performance of any such contract…

15 U.S.C. § 78cc(b) (emphasis added).

103.    The Agreements were made in violation of Section 15(a) of the Act, which prohibits unregistered securities dealers like LG from using the means of interstate commerce "to

effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . ." 15 U.S.C. § 78o(a)(1).

104.    LG is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

105.    LG is not, and at the time of contracting with Plaintiff, was not registered as a securities dealer with the SEC or any regulatory body, as required by Section 15(a) of the Act. 15 U.S.C. § 78o(a)(1)).

106.    LG effected transactions in securities in the Agreements and in the Related Transactions simply by contracting with the plaintiff for the purchase of its securities.

107.    LG used the means of interstate commerce to effectuate the Agreements and the Related Transactions.

108.    As a party to the Agreements and the Related Transactions, VNUE is in contract privity with LG.

109.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, VNUE, a stock issuer, is in the class of persons that the Act was designed to protect.  *See Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982).

110.    Because LG is an unregistered dealer, LG could not lawfully enter into the Agreements to begin with; the Agreements were unlawful when made.

### COUNT II:

*Pursuant to § 29(b) of the Act, Rescission of the Agreement, Which Requires Unlawful Performance In Violation of Section 15(a) of the Act, Because Performance of the Contract Requires LG (an Unregistered Securities Dealer) to Purchase A Convertible Security*

(Against Defendant LG)

111.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs

1 through 110 as though set forth herein.

112.    Section 29(b) of the Act provides in relevant part that:

*Every contract* ... (including any contract for listing a security on an exchange) heretofore or hereafter made, *the performance of which* involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, *shall be void* (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or  … engaged in the performance of any such contract… *Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, ... shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made… any such contract…*

15 U.S.C. § 78cc(b) (emphasis added).

113.    The contract obligated LG, an unregistered securities dealer, to purchase a security: the October 2018 SPA required LG to purchase the convertible note (a security) from the Plaintiff.  *See* **Exhibit 1** at § 3b.

114.    Accordingly, LG violated Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), when it used email, wire transfers and  telephone communications to perform the purchase of the convertible note pursuant to the contract. Unregistered dealers are prohibited from using any means of interstate commerce to effect transactions in securities.

115.    LG is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

116.    LG is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act, 15 U.S.C. § 78o(a)(1).

117.    LG did in fact perform transactions in securities under the Agreements.

118.    LG used the means of interstate commerce to effectuate the Agreements.

119.    As a party to the Agreements, VNUE is in contractual privity with LG.

120.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, VNUE, as an issuer, is within the class of persons that the Act was designed to protect.

121.    Because LG performed the Agreements and the Related Transactions as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when performed when the convertible note was purchased, and through subsequent conversions.

**COUNT III:**

*Violation of Section 20(a) of the Act by Lerman, Greenberg,
and Gellman as Control Persons of LG Based on LG's
Transactions in Securities as an Unregistered Dealer*
(Against Defendants Lerman, Greenberg, and Gellman)

122.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1 through 121 as though set forth herein.

123.    During the relevant period, Lerman, Greenberg, and Gellman were the persons who owned and controlled LG as the LG Managers, who solely control, direct, and authorize LG in its business practice of engaging with issuers.

124.    Lerman, Greenberg, and Gellman had the power and authority to cause LG to engage in the wrongful conduct described in Counts I and II herein.

125.    Lerman, Greenberg, and Gellman did in fact cause LG to engage in the wrongful conduct alleged in Counts I and II herein.

126.    Lerman, Greenberg, and Gellman did not act in good faith.

127.    At the time of the execution of the Agreements, Lerman, Greenberg, and Gellman knew that LG was not registered as a dealer with the SEC.

128.    Lerman, Greenberg, and Gellman directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

129.    Therefore, Lerman, Greenberg, and Gellman each acted as a control person of LG within the meaning of § 20(a) of the Act (15 U.S.C. § 78t).

**COUNT IV:**

*Conducting the Affairs of the*
*RICO Enterprise (RICO, § 1962(c))*
(Against All Defendants)

130.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1 through 129 as though set forth herein.

131.    Each of the three LG Managers is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3):   an individual capable of holding a legal or beneficial interest in property.

132.    LG is a RICO "enterprise" within the meaning of 18 U.S.C. § 1962(c).

133.    The LG Managers agreed to and did conduct and participate in the conduct of LG's affairs through the collection of an unlawful debt from VNUE, specifically, by collecting and attempting to collect debt unenforceable under New York usury laws, having been incurred by loans by the enterprise that charge, take or receive interest at more than double the maximum enforceable legal rate.

134.    Upon information and belief, pursuant to and in furtherance of their scheme, LG is in the business of making loans at usurious interest rates, and thereby committed multiple related acts of unlawful debt collection from a plethora of other needy microcap companies throughout the country.

135.    The LG Managers have directly and indirectly conducted and participated in the conduct of LG's affairs through the collections of unlawful debts described above, in violation of 18 U.S.C. 1962(c).

136.    The activities of LG, which, *inter alia,* lends money to corporations nationwide, affect interstate commerce.

137.    As a direct and proximate result of the Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), VNUE has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

### COUNT V:

*Conspiracy to Collect an Unlawful Debt*
*Under RICO (18 U.S.C. § 1962(d))*
(Against Defendants Lerman, Greenberg, and Gellman)

138.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-137 as though set forth herein.

139.    Upon information and belief, Defendants Lerman, Greenberg, and Gellman intentionally agreed and conspired to, by and through their agents and/or on behalf themselves as individuals, to conduct and participate in the affairs of the enterprise by engaging in the business of collecting unlawful debts from financially struggling public companies, including VNUE.

140.    Upon information and belief, Defendants Lerman, Greenberg, and Gellman knew that their predicate acts were part of the collection of unlawful debts and nonetheless agreed to the commission of those acts to further the schemes described above.  Such conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

141.    As a direct and proximate result of the foregoing conspiracy, the overt acts taken

in furtherance of that conspiracy, and the violations of 18 U.S.C. § 1962(d), VNUE has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

**COUNT VI:**

*Unjust Enrichment*
(Against All Defendants)

142.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-141 as though set forth herein.

143.    The Defendants have received valuable benefits from VNUE, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of VNUE common stock.

144.    These benefits are the result of the wrongful conduct alleged in Counts I-V herein.

145.    By engaging in the securities transactions alleged herein, Defendants violated the federal securities laws.

146.    By charging VNUE an effective interest rate in excess of 25% A.P.R., Defendants violated Section 190.40 of the New York Penal Code, a class E felony.

147.    By collecting unlawful debts from VNUE in excess of twice the maximum enforceable rate, and by conspiring to do so, Defendants violated RICO, 18 U.S.C. § 1962 (c) and (d).

148.    The Defendants have unjustly retained the benefits of having violated the federal securities laws, and RICO at the expense of VNUE and its stockholders.

149.    As a result of the foregoing, the Defendants have been unjustly enriched.

**COUNT VII:**

*Constructive Trust*
(Against All Defendants)

150.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-149 as though set forth herein.

151.     As alleged in Count VI herein, the Defendants have been unjustly enriched by VNUE.

152.     The circumstances are such that it would be fundamentally unjust and inequitable for the Defendants to retain the property conferred on them by VNUE.

153.     VNUE has a specific, identifiable interest in the property unjustly retained by the Defendants as a result of the Agreements.

154.     The Defendants have wrongfully acquired and detained VNUE's property obtained via the Agreements.

155.     Allowing the Defendants to retain the property conferred on them by VNUE would inequitably allow the Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes including without limitation paying their attorney's fees and costs in connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff VNUE seeks a Verdict and Judgment against the Defendants herein as follows:

A.   Count I (Against Defendant LG)

   a.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

        i.   the Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

        ii.   LG is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

        iii.   the Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

        iv.   LG is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by VNUE.

   b.  VNUE requests that the Court enter an Order:

        i.   rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

        ii.   awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

        iii.   requiring LG to return to VNUE all VNUE stock obtained via the Agreements; and

        iv.   awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

B.    Count II (Against Defendant LG)

   a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

        i.   the Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

        ii.   LG is operating as an unregistered dealer in securities, in violation of the

Act (15 U.S.C. § 78o);

    iii.    the Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

    iv.    LG is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by VNUE.

  b.  VNUE requests that the Court enter an Order:

    i.    rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

    ii.    awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

    iii.    requiring LG to return to VNUE all VNUE stock obtained via the Agreements; and

    iv.    awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

C.    Count III (Against Defendants Lerman, Greenberg, and Gellman)

  a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

    i.    Lerman, Greenberg, and Gellman had the power and authority to cause LG to engage in the wrongful conduct described in Counts I and II herein;

    ii.    Lerman, Greenberg, and Gellman did in fact cause LG to engage in the wrongful conduct described in Counts I and II herein; and

    iii.    Lerman, Greenberg, and Gellman acted as the controlling persons of LG within the meaning of Section 20(a) of the Act (15 U.S.C. § 78t(a)).

b.  VNUE requests that the Court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding Lerman, Greenberg, and Gellman jointly and severally liable with and to the same extent as LG is liable to VNUE under Counts I and II herein.

D.  Count IV (Against All Defendants)

a.  VNUE requests that the Court enter a Judgment against all the Defendants as follows:

i.  awarding VNUE compensatory, direct, and consequential damages;

ii.  awarding VNUE treble damages as a remedy for the economic injury sustained by the Defendants' collections of unlawful debt;

iii.  awarding VNUE its attorneys' fees and costs associated with this litigation;

iv.  entering an award of monetary damages jointly and severally against the Defendants; and

v.  awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

E.  Count V (Against Defendants Lerman, Greenberg, and Gellman)

a.  VNUE requests that the Court enter a Judgment against all the Defendants as follows:

i.  awarding VNUE compensatory, direct, and consequential damages;

ii.  awarding VNUE treble damages as a remedy for the economic injury sustained by the Defendants' collections of unlawful debt;

iii.  awarding VNUE its attorneys' fees and costs associated with this

litigation;

    iv.    entering an award of monetary damages jointly and severally against the Defendants; and

    v.    awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

F.    Count VI (Against All Defendants)

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE request that this Court declare that:

        i.    Defendants have voluntarily accepted and retained the property conferred by VNUE on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

        ii.    the circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by VNUE without first paying the value thereof to VNUE, to prevent the Defendants from being unjustly enriched.

    b.    VNUE requests that this Court enter an Order requiring the Defendants to return to VNUE the value of the property they have unjustly retained in the amount of $156,256.93, less the value conferred upon VNUE.

G.    Count VII (Against All Defendants)

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests this Court to declare that:

        i.    Defendants have voluntarily accepted and retained the property conferred by VNUE on the Defendants through and as a result of violations of the

Act (15 U.S.C. § 78o); and

    ii.  the circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by VNUE without first paying the value thereof to VNUE, to prevent the Defendants from being unjustly enriched.

    b.  VNUE requests that this Court enter an Order imposing a constructive trust *pendente lite* and permanently on VNUE property in possession of the Defendants as a result of the property conferred on them by VNUE.

H.  As to each of the foregoing Counts I-VII, to the extent permitted by applicable law, and not otherwise requested, VNUE requests that this Court enter an Order:

    a.  awarding VNUE compensatory, direct, and consequential damages;

    b.  awarding VNUE its attorneys' fees and costs associated with this litigation;

    c.  entering an award of monetary damages jointly and severally against the Defendants; and

    d.  awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues properly so tried.

Date: June 15, 2022                              Respectfully submitted,

                                                 **THE BASILE LAW FIRM P.C.**

                                                 By:*/s/ Mark R. Basile, Esq.*
                                                 Mark R. Basile, Esq..
                                                 **THE BASILE LAW FIRM P.C.**
                                                 390 North Broadway, Suite 140
                                                 Jericho, NY 11753

                                                 Tel.:    (516) 455-1500
                                                 Fax:     (631) 498-0748
                                                 Email: mark@thebasilelawfirm.com

                                                 ***Attorneys for Plaintiff VNUE, Inc.***