## LG UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VNUE, INC.,<br><br>*Plaintiffs,*<br><br>v.<br><br>LG CAPITAL FUNDING, LLC; JOSEPH LERMAN, BORUCH GREENBERG; and DANIEL GELLMAN;<br><br>*Defendants.* | **CIVIL ACTION NO. 2:22-cv-03524**<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff,[1] by and through its undersigned counsel, respectfully states as follows for its First Amended Complaint against Defendants.

### THE PARTIES

1.      VNUE is a Nevada corporation with its principal place of business located at 104 W. 29th Street, 11th Floor, New York, New York 10001.

2.      VNUE is a microcap company that trades on the OTC (Over-the-Counter) Marketplace.

3.      LG is a New York limited liability company with its principal place of business located at 1218 Union Street, Suite 2, Brooklyn, New York 11225.

4.      Lerman is a managing manager of LG and is a 50% owner of LG.

5.      Upon information and belief, Lerman is a resident of the State of New York.

---

[1] The following defined terms are used herein:  Plaintiff VNUE, Inc. ("Plaintiff" or "VNUE"); Defendant LG Capital Funding, LLC ("LG" or "Enterprise"), Joseph Lerman ("Lerman"), Boruch Greenberg ("Greenberg"), and Daniel Gellman ("Gellman") (Lerman, Greenberg, and Gellman, together, the "LG Managers," and LG and the LG Managers, together, "Defendants"); 8% Convertible Redeemable Note, dated October 23, 2018 ("Note") (filed herewith as **Exhibit 1**); 18 U.S.C. §§ 1961, *et seq.* ("RICO").

6.      Greenberg is a managing manager of LG and is a 25% owner of LG.

7.      Upon information and belief, Greenberg is a resident of the State of New York.

8.      Gellman is a managing manager of LG and is a 25% owner of LG.

9.      Upon information and belief, Gellman is a resident of the State of New York.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting claims under RICO.

11.      This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

12.      Venue is proper in this District pursuant to 27 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in this District as Defendants operated their business out of this District.

13.      Venue is also proper because the governing law and forum selection provision of the Note explicitly states that any action brought by either party against the other concerning the transactions contemplated by the Note must be brought in the state or federal courts located in the State of New York.

## FACTUAL BACKGROUND

### *LG's General Business Model*

14.      LG was formed on or about January 30, 2013, and is in the business of lending money.

15.      Since January 2013, LG has made ***more than 330 loans***—styled as convertible notes—to ***more than 100 different borrowers*** (microcap issuers).

16.      LG's convertible notes provide LG with the right to convert the debt purchased in the convertible note into discounted shares of borrower common stock.

17.     Most problematic about this conversion right is that it provides LG a *fixed* conversion discount and, thus, LG always receives stock at a discount to prevailing market prices.

18.     Through its convertible note business, LG has collected more than *23 billion shares* of discounted common stock that have enabled LG to generate **more than $30 million in gross profits** and **at least $20 million in profits**.

19.     LG—located in New York—has collected upon loans it made to businesses across the United States, including but not limited to Colorado,[2] Arizona,[3] and California.[4]

20.     Upon information and belief, a substantial majority—*if not all*—of LG's convertible notes are governed by New York law.

21.     A floating-price conversion right is, under New York, a source of interest.

22.     Under New York law, LG's loans are criminally usurious.  *See* N.Y. Penal Law § 190.40.  To explain, when all sources of interest—the stated interest rate, original issue discount (OID), and floating-price conversion right—are accounted for, the LG loans charge interest at a rate exceeding 25% A.P.R.

### LG's Business Model as Applied to VNUE

23.     One loan transaction exists between LG and VNUE, styled as a convertible note.

24.     On or about October 23, 2018, LG loaned VNUE $52,500.00, subject to a stated interest rate of 8% per annum.  *See* Note at 1.

---

[2] *See, e.g.,* AlumiFuel Power Corporation, Form 10-Q (filed May 23, 2016) (disclosing that AlumiFuel—a Wyoming corporation with its principal place of business in Colorado—issued to LG a $40,000 8% unsecured convertible note during February 2014), *available at* https://bit.ly/3XH3gBq.

[3] *See, e.g.,* NanoFlex Power Corporation, Exhibit 4.6 to Form 8-K (filed May 22, 2019) (disclosing NanoFlex—a Florida corporation with its principal place of business in Arizona—issued to LG a 12% Convertible Redeemable Note during May 2019), *available at* https://bit.ly/3lGIQec.

[4] *See, e.g.,* Rich Pharmaceuticals, Inc., Form 8-K (filed August 18, 2014) (disclosing that Rich Pharmaceuticals—a Nevada corporation with its principal place of business in California—issued to LG two convertible promissory notes, both dated August 14, 2014), *available at* https://bit.ly/3lyzilv.

25.     The Note contemplates that LG, at its option, could convert all or any amount of the debt owed under the Note into newly issued shares of VNUE common stock at a per share price equal to 58% of the *lowest* closing price during the 20-trading days prior to the conversion request.  *See* Note at § 4(a).

26.     Stated differently, LG was entitled to acquire VNUE stock at a 42% discount to its lowest closing trading price during the 20-trading day period prior to LG's conversion request.  *Id.*

27.     The Note is governed by the laws of the State of New York.  *Id.* at § 15.

28.     The floating-price conversion right LG reserved itself in Note is an additional source of interest that must be considered when calculating the true interest rate under New York's usury laws.

29.     The Note provides LG with a floating-conversion discount of 42%, which causes the Note to charge an *additional* 72.4% interest.

30.     The additional interest caused by the Note's floating-price conversion discount is calculated as follows:

42% (the Note's Conversion Discount) *divided by* 58%[5]

*equals* .724 or 72.4%

31.     When the Note's stated interest of 8% per annum is combined with the additional interest charged through the Note's floating-price conversion option, **the true total interest of the Note is equal to 80.4% A.P.R., or more than <u>three times</u> the maximum lawful rate of interest allowed by New York's usury laws.**

32.     To further illustrate the usurious interest charged by the Note's floating-price

---

[5] Conversion Price is the price afforded to the lender (LG) to acquire common stock from the borrower (VNUE) at a discount in lieu of collecting cash on the debt outstanding.  To calculate the conversion price, subtract the conversion discount by 100%.  Here, the conversion discount is 42%.  Therefore, 100% *minus* 42% yields a conversion price of 58%.

conversion right, under a $1.00 discount calculation, LG would receive common shares as if its price was only 58 cents per share.  Under this hypothetical, a $58.00 conversion of debt would be paid with 100 shares of stock that are worth $100.00 (at a per share price of $1.00), and a $100.00 conversion of debt would be repaid with 172 shares worth $172.00.

33.     The excessive consideration LG acquired through the conversions submitted pursuant to the Note (discussed in greater detail below), further demonstrates that the excessive, usurious interest rate LG charged VNUE in the Note.

34.     The LG Managers, individually or collectively, purposefully and intentionally negotiated for and obtained the floating-price conversion right set forth in the Note knowing that it would provide them with the ability to collect additional consideration at a usurious rate.

35.     On or about October 23, 2018, LG wire transferred the sum of $52,500.00 to VNUE pursuant to the Note.

36.     LG subsequently collected the Note through six separate conversions.

37.     Specifically, LG collected the debt imposed by the Note on the dates and in the amounts as follows:

   a.  On May 2, 2019, LG converted $12,257.57 of debt charged under the Note into 15,095,529 shares of VNUE common stock, which had an estimated aggregate value of $48,305.69;[6]

   b.  On May 20, 2019, LG converted $16,652.74 of debt charged under the Note into 16,889,188 shares of VNUE common stock, which had an estimated aggregate value of $55,734.32;[7]

---

[6] Calculated by multiplying the number of shares issued and VNUE's common stock closing price ($0.0032) as of the date of conversion (May 2, 2019).
[7] Calculated by multiplying the number of shares issued and VNUE's common stock closing price ($0.0033) as of the date of conversion (May 20, 2019).

    c.   On June 6, 2019, LG converted $10,249.67 of debt charged under the Note into 11,044,903 shares of VNUE common stock, which had an estimated aggregate value of $20,985.32;[8]

    d.   On June 18, 2019, LG converted $6,067.19 of debt charged under the Note into 8,046,671 shares of VNUE common stock, which had an estimated aggregate value of $10,460.67;[9]

    e.   On June 27, 2019, LG converted $5,542.45 of debt charged under the Note into 9,555,948 shares of VNUE common stock, which had an estimated aggregate value of $12,422.73;[10] and

    f.   On July 22, 2019, LG converted $4,236.71 of debt charged under the Note into 10,435,246 shares of VNUE common stock, which had an estimated aggregate value of $8,348.20.[11]

38.    In total, LG collected ***$156,256.93*** of consideration from VNUE through conversions pursuant to the Note.

39.    Pursuant to the Note, LG advanced to VNUE $52,500.00 but subsequently collected $156,256.93 worth of consideration.   Thus, ***LG collected $103,756.93 worth of consideration in excess of what was loaned to VNUE.***

### The RICO Enterprise

40.    LG is a legal entity—formed in 2013—and legally distinct from the LG Managers.

41.    LG is the RICO "enterprise" within the meaning set forth in 18 U.S.C. § 1961(4).

42.    The goal, objective, and/or purpose of the Enterprise is to profit from the collection of usurious debts that are charged through convertible notes, such as the Notes.

43.    Publicly-available information demonstrates that the Enterprise has been actively

---

[8] Calculated by multiplying the number of shares issued and VNUE's common stock closing price ($0.0019) as of the date of conversion (June 6, 2019).

[9] Calculated by using VNUE's common stock closing price ($0.0013) as of the date of conversion (June 18, 2019).

[10] Calculated by multiplying the number of shares issued and VNUE's common stock closing price ($0.0013) as of the date of conversion (June 27, 2019).

[11] Calculated by multiplying the number of shares issued and VNUE's common stock closing price ($0.0008) as of the date of conversion (July 22, 2019).

engaged in its unlawful business of usurious lending since at least 2013.

44.     Publicly-available information demonstrates that the Enterprise has made similar, unlawful loans governed by New York law to other companies, including, for example:

a.   During October 2014, Astika Holdings, Inc. ("Astika") sold to LG an 8% Convertible Debenture[12] accruing interest at a stated interest rate of 8% A.P.R. and provided LG the right to convert the debt owed under the debenture into shares of Astika common stock at a discounted price equal to 55% of the lowest trading price for Astika's common stock stock during the 20-trading day period preceding the date of conversion (the "Astika Note");

b.   On May 4, 2015, Bergio International, Inc. ("Bergio") sold to LG an 8% Convertible Redeemable Note accruing interest at a stated interest rate of 8% A.P.R. and provided LG the right to convert the debt owed under the debenture into shares of Bergio common stock at a discount price equal to 60% of the lowest trading price for Bergio's common stock during the prior 20-trading day period preceding the date of conversion (the "Bergio Note"); and

c.   On August 19, 2015, ExeLED Holdings, Inc. ("ELED") issued[13] to LG an 8% Convertible Redeemable Note accruing interest at a stated interest rate of 8% A.P.R. and provided LG the right to convert the debt owed under the debenture into shares of ELED common stock at a discount price equal to 58% of the lowest trading price for ELED's common stock during the 15-trading day period preceding the date of conversion (the "ELED Note") (the Astika Note, Bergio Note, and ELED Note, together, the "LG Usurious Loans").

45.     The LG Usurious Loans are governed by New York law and violate New York's usury laws in that they charge interest rates in excess of the 25% A.P.R. maximum lawful rate of

---

[12] A convertible debenture is another debt vehicle that is, in fact, a loan transaction that—like the convertible notes—provides the creditor certain convertible security features including, most relevant here, the right to convert the debt into shares of a public company's common stock. *See, e.g.,* Alliance BioEnergy Plus, Inc., Form 8-K (filed Aug. 3, 2015) (disclosing that on June 27, 2015, Alliance sold to LG a Convertible Debenture, with a principal balance of $105,000.00 due on or before March 27, 2016, that accrues interest at 8% per annum and provides LG with the right to convert the debt into Alliance shares at a 60% discount to the lowest trading price during the 15-day period preceding a conversion), *available at* https://bit.ly/3jZID5G.

[13] The ELED Note is the result of LG purchasing three separate loans—each styled as convertible notes—from KBM Worldwide, Inc. (the "KBM Notes"). Pursuant to the KBM Notes, KBM advanced the total amount of $129,500.00 to ELED. Pursuant to a Debt Purchase Agreement between KBM and LG, LG purchased ELED's debt from KBM, resulting in the KBM Notes each being canceled and LG being issued a new note—the ELED Note—memorializing the transfer of the debt obligation to LG. Relevant here is that each of the KBM Notes were governed by the laws of the State of New York and contain a floating-price conversion option that can cause each of the KBM Notes to be criminally usurious loans.

interest.  *See* N.Y. Penal § 190.40.

46.     Simple calculations reveal that each of the LG Usurious Loans charge more than 25% A.P.R.:

    a.   Astika Note

<u>Step 1: Calculate the Conversion Discount Interest</u>

45 (Conversion Discount) *divided by* 55[14]
*equals* .818 or 82% (Conversion Discount Interest)

<u>Step 2: Calculate the Total Interest</u>

82% *plus* 8% (Stated Interest) *equals* **90% A.P.R**

    b.   Bergio Note

<u>Step 1: Calculate the Conversion Discount Interest</u>

40 (Conversion Discount) *divided by* 60[15]
*equals* .67 or 67% (Conversion Discount Interest)

<u>Step 2: Calculate the Total Interest</u>

67% *plus* 8% (Stated Interest) *equals* **75% A.P.R.**

    c.   ELED Note

<u>Step 1: Calculate the Conversion Discount Interest</u>

42 (Conversion Discount) *divided by* 58[16]
*equals* .724 or 72.4% (Conversion Discount Interest)

---

[14] 55 is the difference between 100 and the conversion discount (45).  The 55 is the conversion price, or the price that LG is paying to acquire the borrower's common stock.  By dividing the conversion discount to LG by the conversion price LG pays to acquire the borrower's common stock, the result yields the conversion discount interest.

[15] 40 is the difference between 100 and the conversion discount (60).  The 40 is the conversion price, or the price that LG is paying to acquire the borrower's common stock.  By dividing the conversion discount to LG by the conversion price LG pays to acquire the borrower's common stock, the result yields the conversion discount interest.

[16] 58 is the difference between 100 and the conversion discount (42).  The 58 is the conversion price, or the price that LG is paying to acquire the borrower's common stock.  By dividing the conversion discount to LG by the conversion price LG pays to acquire the borrower's common stock, the result yields the conversion discount interest.

<u>Step 2: Calculate the Total Interest</u>

72.4% *plus* 8% (Stated Interest) *equals **80.4% A.P.R.***

47.     LG's performance of the LG Usurious Loans demonstrates that the floating-price conversion right charges a usurious rate of interest:

> a.  Under the Astika Note, LG loaned $31,500.00 to Astika and collected $37,648.00 of debt through numerous conversions that provided LG with 18,263,209 shares of Astika common stock with an estimated aggregate value of $167,742.84—***more than 5 times (and approximately $136,242.84 of out-of-pocket loses) what Astika was advanced;***
>
> b.  Under the Bergio Note, LG loaned $36,750.00 to Bergio and collected $32,787.00 of debt through numerous conversions that provided LG with 522,376,495 shares of Bergio common stock with an estimated aggregate value of $ 759,579,825.00—***more than <u>20,000</u> times (and approximately <u>$759,543,075.00</u> of out-of-pocket loses) what Bergio was advanced;*** and
>
> c.  Under the ELED Note, ELED was advanced $129,500.00 to and LG collected $123,292.95 of debt through numerous conversions that provided LG with 156,712,654 shares of ELED common stock with an estimated aggregate value of $301,681.58—***nearly 3 times (and approximately $178,388.63 of out-of-pocket loses) what ELED was advanced.***

48.     Stated differently, in each of the LG Usurious Loans (like here), LG used the conversion feature to collect consideration worth several times more than what LG actually loaned and, thus, caused the borrowing issuer to suffer thousands—*if not hundreds of thousands and even millions*—of out-of-pocket losses.

49.     Upon information and belief, LG has made ***more than 330 other usurious loans***, each governed by New York law, that (i) were unenforceable under New York law because they charged usurious rates of interest that (ii) were, in fact, twice the maximum enforceable rate of interest allowed by New York law, and, thus, LG has charged, collected, and profited from the unlawful debts charged to other issuers.

50.     The volume of loans and profits generated therefrom during a prolonged period of time—starting as early as 2013 and continuing through the date hereof—demonstrates that LG is

in the business of usurious lending.

*The RICO Culpable Persons*

51.    The LG Managers are each individuals who are capable of holding a legal and/or beneficial interest in property and, therefore, each of the LG Managers are a "person" within the meaning set forth in 18 U.S.C. § 1961(3).

52.    The Enterprise (LG), on the one hand, and the LG Managers, on the other hand, are legally distinct from each other.

53.    The Enterprise and the LG Managers are legally distinct from each, and each have legal rights, responsibilities, obligations, power, and privileges separate and apart from each other.

54.    The Enterprise commits its RICO violations of lawful debt collection under the direction and control of the LG Managers.

55.    The LG Managers, collectively or individually, are the managing members and, thus, ultimate decision makers of LG.

56.    Lerman is a RICO culpable person because, *inter alia*:

   a.    Lerman is an individual capable of holding a legal or beneficial interest in property.

   b.    Upon information and belief, Lerman is one of the control person's and decision makers of LG and, at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control LG's statements, representations, and decisions.

   c.    Upon information and belief, Lerman is the ultimate decision maker of LG, exercises final decision-making authority over LG's acts and decisions, executes all agreements and the majority of the conversion notices submitted thereunder, and approves the majority of LG wire transfers to borrowers.

   d.    Upon information and belief, Lerman—alongside the other LG Managers—is responsible for the day-to-day operations of LG and has final say on all of its business decisions, including without limitation which usurious loans LG will fund and when to collect on such unlawful loans.

e. Upon information and belief, Lerman—alongside the other LG Managers—is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by LG to accomplish its goals, objectives, and/or purpose, chiefly among which being usurious lending, including: (i) supervising agents and/or employees of LG; (ii) determining the form of the agreements used by LG to disguise its usurious loans as lawful lending transactions to hide its true business of usurious lending, including the Notes in this case; (iii) determining the form of the usurious loan, including the principal amounts, stated interest rate, OID, and floating-price conversion right; (iv) approving the making of the usurious loans to issuers who the Enterprise has solicited and/or applied for such usurious loans; (v) establishing and maintaining the methods of collecting the payments on the usurious loans, including requesting issuer's transfer agents to enter into irrevocable instruction agreements and retaining lawyers to author legal opinion letters to ensure conversion requests are properly submitted and processed.

f. Upon information and belief, Lerman—alongside the other LG Managers—takes actions and directs employees and/or agents of the Enterprise to take actions necessary to accomplish the overall goals, objectives, and/or purpose of the Enterprise.

57. Greenberg is a RICO culpable person because, *inter alia*:

a. Greenberg is an individual capable of holding a legal or beneficial interest in property.

b. Upon information and belief, Greenberg is one of the control person's and decision makers of LG and, at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control LG's statements, representations, and decisions.

c. Upon information and belief, Greenberg—alongside the other LG Managers—is responsible for the day-to-day operations of LG and exercises decision making authority over LG's business decisions, including without limitation which usurious loans LG will fund and when to collect on such unlawful loans.

d. Upon information and belief, Greenberg—alongside the other LG Managers—is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by LG to accomplish its goals, objectives, and/or purpose, chiefly among which being usurious lending, including: (i) supervising agents and/or employees of LG; (ii) determining the form of the agreements used by LG to disguise its usurious loans as lawful lending transactions to hide its true business of usurious lending, including the Notes in this case; (iii) determining the form of the usurious loan, including the principal amounts, stated interest rate, OID, and floating-price conversion right; (iv) approving the making of the usurious loans to issuers who the Enterprise has solicited and/or applied for such usurious loans; (v) establishing and

maintaining the methods of collecting the payments on the usurious loans, including requesting issuer's transfer agents to enter into irrevocable instruction agreements and retaining lawyers to author legal opinion letters to ensure conversion requests are properly submitted and processed.

e. Upon information and belief, Greenberg—alongside the other LG Managers—takes actions and directs employees and/or agents of the Enterprise to take actions necessary to accomplish the overall goals, objectives, and/or purpose of the Enterprise.

58. Gellman is a RICO culpable person because, *inter alia*:

a. Gellman is an individual capable of holding a legal or beneficial interest in property.

b. Upon information and belief, Gellman is one of the control person's and decision makers of LG and, at all relevant times has possessed and exercised the power and authority to, directly or indirectly, control LG's statements, representations, and decisions.

c. Upon information and belief, Gellman—alongside the other LG Managers—is responsible for the day-to-day operations of LG and exercises decision making authority over LG's business decisions, including without limitation which usurious loans LG will fund and when to collect on such unlawful loans.

d. Upon information and belief, Gellman—alongside the other LG Managers—is responsible for creating, approving, and implementing the policies, practices, and instrumentalities used by LG to accomplish its goals, objectives, and/or purpose, chiefly among which being usurious lending, including: (i) supervising agents and/or employees of LG; (ii) determining the form of the agreements used by LG to disguise its usurious loans as lawful lending transactions to hide its true business of usurious lending, including the Notes in this case; (iii) determining the form of the usurious loan, including the principal amounts, stated interest rate, OID, and floating-price conversion right; (iv) approving the making of the usurious loans to issuers who the Enterprise has solicited and/or applied for such usurious loans; (v) establishing and maintaining the methods of collecting the payments on the usurious loans, including requesting issuer's transfer agents to enter into irrevocable instruction agreements and retaining lawyers to author legal opinion letters to ensure conversion requests are properly submitted and processed.

e. Upon information and belief, Gellman—alongside the other LG Managers—takes actions and directs employees and/or agents of the Enterprise to take actions necessary to accomplish the overall goals, objectives, and/or purpose of the Enterprise.

59. At all times relevant hereto, each of the LG Managers intended to engage in the

practice of making and collecting upon the usurious loans charged through the convertible notes, including the Note, with the knowledge that such activities were unlawful, and not in good faith.

60.     Upon information and belief, through millions—*possibly even tens of millions*—of dollars in salaries, bonuses, profits, and/or other distributions from the Enterprise, each of the LG Managers has financially benefited from the Enterprise achieving its goals, objectives, and/or purpose of making and collecting on unlawful debts.

### *RICO Act:  Unlawful Debt Collection*

61.     The Enterprise (LG)—at the direction of the LG managers—engages in the RICO act of unlawful debt collection, as defined in 18 U.S.C. § 1961(6).

62.     As alleged herein, LG has, since 2013, engaged in the business of usurious lending, in violation of New York law.

63.     The Note constitutes a loan; it is a transaction that memorializes a promise by VNUE to repay to LG the loaned principal, plus interest, in some form of consideration by a maturity date.

64.     The Note is unenforceable in whole pursuant to New York's usury laws because it charges interest at a rate exceeding 25% A.P.R., in violation of New York Penal Law § 190.40.

65.     By charging more than 50% A.P.R., the Note charges interest at a rate more than double the lawful maximum rate of interest permitted by New York's usury laws.

### *The RICO Enterprise Affects Interstate Commerce*

66.     LG is engaged in interstate commerce and uses the instrumentalities of interstate commerce in its usurious lending business, as described herein.

67.     LG is located in New York and operates its usurious lending business from within the State of New York, where it, *inter alia*, negotiates the usurious loan from New York, memorializes the usurious loans in New York, lends money from its bank accounts situated in

New York, and subsequently decides when to collect the usurious debt via conversions from New York.

68.     LG, in furtherance of its usurious lending business, extensively used interstate emails, mail, wire transfers, and securities transactions to, among other things, coordinate with persons situated outside the State of New York to facilitate its goal of usurious lending and unlawful debt collection.

69.     For example, at all times relevant hereto, VNUE's Chief Executive Officer resided in and worked from Tennessee.  Thus, all interactions, communications, and negotiations by and between VNUE and LG—including the exchanging of drafts and transmission of the final and executed copies of the Note—affected interstate commerce as such interactions, communications, and negotiations were conducted through the usage of the means of interstate commerce (*e.g.*, mail, emails, texts).

70.     LG, also in the furtherance of its usurious lending business, commences actions and prosecutes its claims against businesses in New York and across the United States.[17]

### VNUE Has Been—And Continues To Be—Injured By Defendants' Collection of the Unlawful Debt

71.     VNUE would not have suffered the injuries and damages but for the violations of RICO alleged herein, including both the overt acts of collecting the unlawful debts and conspiracy to commit such RICO acts.

72.     The injuries to VNUE directly, proximately, reasonably, and foreseeably resulting from or caused by the violations of RICO alleged herein include, but are not limited to, the remittance of valuable consideration—newly issued shares of VNUE common stock—in excess

---

[17] *See, e.g., Vision Industries Corp.*, Case No. 2:14-BK-28225 (Bankr. C.D. Cal.); *5Barz International Inc.*, Case No. 1:20-BK-14866 (Bankr. S.D. Fla.).

of the amount that was actually loaned to VNUE through the Note, a loan transaction that is (i) void in whole because of New York's usury laws,[18] and (ii) charge an interest rate that is at least twice the maximum lawful rate of interest allowed by New York's usury laws.[19]

73.     Specifically, VNUE has remitted consideration with an estimated aggregate value of ***$156,256.93—$103,756.93 in excess of what was actually loaned to VNUE.***

74.     VNUE has also suffered damages by incurring attorneys' fees and costs associated with exposing, prosecuting, and defending against the RICO violations alleged herein.

75.     All of the foregoing harm was foreseeable by the Defendants and was directly and proximately caused by their violations of RICO alleged herein.

76.     The assessment of the total damages to VNUE due to the Defendants's violations of RICO alleged herein is difficult to quantify and will be determined at trial.

## CAUSES OF ACTION

### Count I:  RICO, 18 U.S.C. § 1962(c)

### (Against the LG Managers)

77.     VNUE repeats, reiterates, and re-alleges each and every allegation of the paragraphs as though fully set forth herein.

78.     LG is an "enterprise" within the meaning set forth in RICO, § 1961(4).

79.     The LG Managers are each a culpable "person" within the meaning set forth in RICO, § 1961(3).

80.     RICO defines, in relevant part, an "unlawful debt" as:

> a debt (A) … which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing

---

[18] *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (N.Y. 2021).
[19] *See* N.Y. Penal § 190.40.

of value at a rate usurious under State or Federal law, where
the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6).

81.     The Note is governed by New York law, which prohibits the charging, taking, or
receiving of interest at a rate exceeding 25% A.P.R.  *See* N.Y. Gen. Oblig. Law §§ 5-501, 5-511,
5-521; N.Y. Penal Law § 190.40.  *See also Adar Bays, supra.*

82.     Through the Note, the Enterprise charged, took, and received interest from VNUE
at a rate in excess of 50% A.P.R., or ***more than twice*** the maximum enforceable rate of interest
permitted by New York's usury laws.

83.     The Enterprise's goal, objective, and/or purpose is to profit from the collection of
usurious debts that are charged through convertible notes, such as the Note, that charge, in fact,
true interest rates that are more than double the lawful maximum, enforceable rate of interest
permitted by New York law.

84.     Upon information and belief, pursuant to and in furtherance of their scheme, the
Enterprise is in the business of making loans at usurious rates of interest and thereby committed
multiple acts of unlawful debt collection from a plethora of other desperate public companies
throughout the country.

85.     The Enterprise, through its managers, agents, and/or employees:  (i) locates and
solicits microcap issuers, like VNUE; (ii) offers funding to microcap issuers; (iii) determines the
form of the usurious loan, including the principal amounts, stated interest rate, OID, and floating-
price conversion right; (iv) funds the usurious loans; and (v) collects the unlawful debt.

86.     The Enterprise benefits from the unlawful debt it collected from VNUE by
receiving all or a portion of the proceeds of the unlawful debts charged under the Note, which,
among other things, enabled the Enterprise to profit from the unlawful debt and/or use the proceeds

to fund additional, usurious loans.

87.    The Enterprise commits its violations of RICO under the direction and control of the LG Managers, who—acting either individually and/or collectively—are the ultimate-decision makers and beneficiaries of the Enterprise.

88.    The Enterprise conducts its unlawful business through the means and instrumentalities of interstate commerce, including but not limited to interstate emails, mail, wire transfers, and securities transactions.

89.    At all times relevant hereto, the LG Managers, individually and/or collectively, intended to engage in the violations of RICO alleged herein, with actual knowledge of their and the Enterprise's illegal activities, and not in good faith.

90.    The violations of RICO alleged herein have injured and continue to injure VNUE and its business and property.

91.    As part of its continuous unlawful debt-collection scheme, the Defendants charged an unlawful debt onto VNUE through the Note, pursuant to which they collected $156,256.93 worth of consideration from VNUE.

92.    VNUE has suffered out-of-pocket losses of $103,756.93, calculated by deducting the $52,500.00 that was advanced under the Note from the $156,256.93 of consideration the Enterprise collected through the Note.

93.    The Defendants' unlawful debt-collection consists of 6 separate collections, starting on May 2, 2019 and ending on July 22, 2019, with each collection constituting a separate act of unlawful debt-collection in furtherance of the Defendants' unlawful scheme.

94.    The injuries to VNUE directly, proximately, reasonably, and foreseeably resulting from or were caused by the violations of RICO alleged herein include, but are not limited to, the

remittance of valuable consideration—newly issued shares of VNUE common stock—in excess of the amounts that were actually loaned to VNUE through loan transactions that are (i) void in whole because of New York's usury laws,[20] and (ii) charge an interest rate that is at least twice the maximum lawful rate of interest allowed by New York's usury laws.

95.     VNUE has also suffered damages by incurring attorneys' fees and costs associated with exposing, prosecuting, and defending against the RICO violations alleged herein.

96.     All of the foregoing harm was foreseeable by the Defendants and was directly and proximately caused by their violations of RICO alleged herein.

97.     The assessment of the total damages to VNUE due to the Defendants' violations of RICO alleged herein is difficult to quantify and will be determined at trial.

**Count II:  RICO, 18 U.S.C. § 1962(d)**

**(Against the LG Managers)**

98.     VNUE repeats, reiterates, and re-alleges each and every allegation of the paragraphs as though fully set forth herein.

99.     LG is an "enterprise" within the meaning set forth in RICO, § 1961(4).

100.    The LG Managers are each a culpable "person" within the meaning set forth in RICO, § 1961(3).

101.    RICO defines, in relevant part, an "unlawful debt" as:

> a debt (A) … which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6).

---

[20] *See Adar Bays, supra.*

102.    The Note is governed by New York law, which prohibits the charging, taking, or receiving of interest at a rate exceeding 25% A.P.R.  *See* N.Y. Gen. Oblig. Law §§ 5-501, 5-511, 5-521; N.Y. Penal Law § 190.40.  *See also Adar Bays, supra.*

103.    Upon information and belief, the LG Managers each agreed and conspired to, by and through their agents and/or on behalf of themselves as individuals, conduct and participate in the affairs of the Enterprise by engaging in the business of collecting unlawful debts, as defined in RICO [§ 1961(6)], from financially struggling public companies, including VNUE.

104.    Upon information and belief, the LG Managers knew that their acts were part of and in furtherance of the collection of unlawful debts and, nonetheless, agreed to the commission of those acts to further the scheme described herein.  Such conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

105.    As a direct and proximate result of the foregoing conspiracy, the overt acts taken in furtherance of that conspiracy and the violations of 18 U.S.C. § 1962(d), VNUE has been injured in its business and property because, among other things, its market capitalization has been significantly decreased, its common stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

### Count III:  Unjust Enrichment

### (Against All Defendants)

106.    VNUE repeats, reiterates, and re-alleges each and every allegation of the paragraphs as though fully set forth herein.

107.    The Defendants have received valuable benefits from VNUE, including, *inter alia*, the stock and profits realized from the acquisition and—upon information and belief—subsequent sale of the unlawfully issued and/or delivered shares of VNUE common stock.

108.     These benefits are the result of the wrongful conduct alleged herein in Counts I and II.

109.     These benefits are the result of LG's enforcement of a patently unlawful loan transaction that violations New York's usury laws.

110.     By charging an interest rate in excess of 25% A.P.R., LG violated Section 190.40 of the New York Penal Code, a Class E Felony.

111.     The Defendants have unjustly retained these benefits of committing a Class E felony at VNUE and its stockholders' expense.

112.     As a result, the Defendants have been unjustly enriched.

## JURY DEMAND

VNUE demands a trial by jury on all issues properly so tried.

## PRAYER FOR RELIEF

**WHEREFORE,** VNUE seeks a Verdict and Judgment against the Defendants herein as follows:

A.     On its First and Second Claims, awarding VNUE treble damages in an amount to be determined at trial pursuant to 18 U.S.C. § 1964(c);

B.     On its First and Second Claims, awarding VNUE interest and costs and expenses in prosecuting this action, including reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c);

C.     On its Third Claim, ordering Defendants to the return the unlawfully acquired VNUE property or—in the event returning such property is not possible—the value of the unlawfully acquired VNUE property in the amount of $103,756.93 (the difference between and the amount LG advanced to VNUE under the Note and the

aggregate value of the consideration Defendants wrongfully acquired under the Note); and

D.    For such other and further relief as the Court may deem just, proper, and in the interest of justice.

DATED:        March 7, 2023                    Respectfully submitted,

                                              **THE BASILE LAW FIRM P.C.**

                                               _/s/ Eric J. Benzenberg_
                                              Eric J. Benzenberg, Esq.
                                              Mark R. Basile, Esq.
                                              390 N. Broadway, Ste. 140
                                              Jericho, NY 11753
                                              Tel.:        (516) 455-1500
                                              Fax:        (631) 498-0748
                                              Email:    eric@thebasilelawfirm.com
                                                            mark@thebasilelawfirm.com

                                              _Attorneys for Plaintiff VNUE, Inc._