UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
VNUE, INC.,

                              Plaintiff,

                                                    **REPORT AND**
                                                    **RECOMENDATION**
         -against-                                  22-CV-3524-NRM-SJB

LG CAPITAL FUNDING, LLC., JOSEPH LERMAN,
BORUCH GREENBERG, and DANIEL GELLMAN,

                              Defendants.
---------------------------------------------------------------X
**BULSARA, United States Magistrate Judge:**

    Plaintiff VNUE, Inc. ("Plaintiff" or "VNUE") is a microcap company operating in

the technology space, and whose shares are traded as Over-the-Counter securities.[1]  LG

Capital Funding, LLC ("LG") is a lender that issues loans to companies like VNUE, in the

form of convertible promissory notes that permit LG to redeem the loan principal for

shares of the borrower.  This action arises from a loan of $52,500.00 (the "Note")

between LG and VNUE.  (Am. Compl. ("AC"), Dkt. No. 24 ¶¶ 23–24).  As with its other

loans, the Note gave LG the option to convert Plaintiff's debt into shares of VNUE

common stock.  (*Id.* ¶ 25).  LG converted the debt and received VNUE shares worth

$156,256.93.  (*Id.* ¶ 38).

    VNUE alleges that the disparity between the value of the conversion and the

original principal loan amount makes the loan usurious under New York law.  And in

light of the pattern of making such loans, it now alleges LG violated the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and was

---

[1] Over-the-Counter securities do not meet the requirements to qualify for trading
on a national exchange like NASDAQ or the NYSE.

unjustly enriched.  (AC ¶¶ 43–45).  Defendants LG, Joseph Lerman, Boruch Greenberg, and Daniel Gellman (collectively, the "Defendants") have moved to dismiss the Amended Complaint ("AC").  For the reasons described below, the Court respectfully recommends the motion be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

For the purposes of this motion, the Court is "required to treat" the Complaint's "factual allegations as true, drawing all reasonable inferences in favor of [the Defendants] to the extent that the inferences are plausibly supported by allegations of fact."  *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).  The Court "therefore recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the court, as we have no way of knowing at this stage what are the true facts."  *Id.*

LG is a limited liability company with its principal place of business in New York. (AC ¶ 3).  Joseph Lerman is a manager and 50% owner of LG; Boruch Greenberg is a manager and 25% owner; and Daniel Gellman is also a manager and 25% owner.  (*Id.* ¶¶ 4, 6, 8).  LG lends money in the form of convertible notes and has issued more than 330 loans to more than 100 different borrowers.  (*Id.* ¶ 15).  These convertible notes provide LG with the right to convert the debt purchased in the notes into discounted shares of borrower common stock.  (*Id.* ¶ 16).  The price at which LG may convert is discounted, meaning LG "always receives stock at a discount to prevailing market prices." (*Id.* ¶ 17).  And through this loan business, LG has collected 23 billion shares of common stock and generated at least $20 million in profits.  (*Id.* ¶ 18).

VNUE is a microcap company based in Nevada whose stock trades on the Over-the-Counter marketplace.  (AC ¶¶ 1, 2).  On October 23, 2018, LG loaned VNUE

$52,500.00.  (VNUE Inc. Convertible Redeemable Note dated Oct. 23, 2018 (the "Note"), attached as Ex. 1 to AC at 1).  The Note is subject to a yearly interest rate of 8%.  (*Id.*).  The Note provides that LG (or any holder) can, at any time, convert all or any amount of the debt into shares of VNUE stock at a discounted price: 58% of the lowest trading price of VNUE's common stock for the prior 20 trading days, as reported on the National Quotations Bureau OTC Market Exchange.  (*Id.* § 4(a); AC ¶ 25).  (Put differently, this amounts to a 42% discount on VNUE trading price, (AC ¶ 26)).  The Note included a choice-of-law provision, indicating the Note is governed by New York law.  (Note ¶ 15).  Between May and July 2019, LG exercised its option to convert the $52,500 debt over six transactions, converting the debt into over 71 million shares of VNUE stock with a market value of $156,256.93.  (AC ¶¶ 37–38).

VNUE alleges that the discounted conversion rate (which is discounted from the prevailing market price, i.e., a "floating-price conversion rate") is a form of interest.  (*Id.* ¶ 22).  As mentioned, under the Note, this discount percentage is 42%.  And LG is also entitled to yearly interest rate of 8% on the Note.  When combined, VNUE alleges the Note's true interest rate is 80.4%.  (*Id.* ¶¶ 29–31).  The Note, VNUE alleges, is therefore in violation of New York's usury laws because it charges interest at a rate exceeding 25% in violation of New York Penal Law § 190.40.  (*Id.* ¶¶ 62–65).

VNUE ultimately alleges that LG is a RICO "enterprise," whose objective is to profit from the collection of usurious debts.  (*Id.* ¶¶ 40–42).  The Amended Complaint details other usurious loans made by LG to borrowers other than VNUE, including to Astika Holdings, Inc., Bergio International, Inc., and ExeLED Holdings, Inc.  (*Id.* ¶¶ 44, 46–47).

VNUE alleges that Lerman, Greenberg, and Gellman (the "LG Managers") operate LG as a RICO enterprise. (AC ¶¶ 40–50). To that end, it sets forth three claims in the AC: (1) RICO, 18 U.S.C. § 1962(c), against the LG Managers, (AC ¶¶ 77–97); (2) RICO, 18 U.S.C. § 1962(d), against the LG Managers, (AC ¶¶ 98–105); and (3) unjust enrichment against the LG Managers and LG. (*Id.* ¶¶ 106–12). The Defendants moved to dismiss all claims. Judge Nina R. Morrison referred the motion to the undersigned for a report and recommendation prior to briefing. (Order dated Dec. 16, 2022); (Notice of Mot. to Dismiss dated Mar. 31, 2023, Dkt. No. 25 at 1; Def. Mem. of Law in Supp. of Mot. to Dismiss dated Mar. 31, 2023 ("Def. Mem. of Law"), Dkt. No. 27 at 2).

## DISCUSSION

"The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of . . . claims for relief." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018) (citing *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)). In deciding such a motion, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quotations and alteration omitted); *Amadei*, 348 F. Supp. 3d at 155 ("[W]hen reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of [the non-moving party].").

Once the facts are construed in the light most favorable to the non-moving party—here, VNUE—to avoid dismissal, there must be sufficient facts that allege a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." (quotations omitted)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (quotations omitted). In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citation omitted). The determination of whether a party has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Escamilla v. Young Shing Trading Co.*, No. 17-CV-652, 2018 WL 1521858, at *2 (E.D.N.Y. Jan. 8, 2018), *report and recommendation adopted*, 2018 WL 1033249, at *3 (Feb. 23, 2018).

I.    RICO Claims

RICO Section 1962(c) provides it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Unlawful debt" is a debt "which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable

rate[.]"  *Id.* § 1961(6)(B).  Under New York law, a loan is criminally usurious if the interest rate "exceed[s] twenty-five per centum per annum or the equivalent rate for a longer or shorter period."  N.Y. Penal Law § 190.40.

"[T]o state a RICO claim based on the collection of an unlawful debt, a plaintiff must allege that (1) 'the debt was unenforceable in whole or in part because of state or federal laws relating to usury,' (2) 'the debt was incurred in connection with the business of lending money . . . at a [usurious] rate,' and (3) 'the usurious rate was at least twice the enforceable rate."  *Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018) (quoting *Durante Bros. & Sons v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985) (alterations in original) (internal quotations omitted)).[2]

As noted, VNUE alleges the LG Managers violated the RICO statute by lending VNUE money at a usurious rate; that is, VNUE alleges that the Note violates New York's criminal usury law—which prohibits charging interest at a rate greater than 25%—by charging an effective 80.4% interest rate, which is more than twice the enforceable rate. (AC ¶¶ 81–82).  None of LG's arguments for dismissal have any merit.

LG contends that VNUE failed to allege—as RICO requires—that LG engaged in loan sharking or making usurious loans.  (Def. Mem. of Law at 5).[3]  At worst, LG claims,

---

[2] These requirements are in addition to those for alleging a RICO claim under Section 1962(c), which require a plaintiff to allege "that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Nowak v. JPMorgan Chase & Co.*, 847 F. App'x 31, 33 (2d Cir. 2021) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). Other than the arguments discussed, LG has not made any other arguments suggesting that VNUE has failed to plead these elements.

[3] "The requirement that the loan ha[s] been incurred in connection with 'the business of' making usurious loans" is from the Second Circuit's 1985 opinion in *Durante Bros. & Sons, Inc. v. Flushing National Bank*, 755 F.2d 239, 250 (2d Cir. 1985) (noting that RICO is not "sporadic activity" (quotations omitted)).  In a later summary

the Amended Complaint alleges LG is a "legitimate business that engaged in occasional usurious transactions." (*Id.*).  This argument downplays and misreads VNUE's allegations.

The Amended Complaint goes far beyond merely alleging that LG only made occasional usurious transactions.  The core of the pleading alleges that LG's entire business is based on providing loans at a usurious rate.  In addition to alleging how its specific loan was usurious, (AC ¶¶ 29–31), VNUE included three specific examples of *other* allegedly criminally usurious loans executed by LG.  (*Id.* ¶¶ 44–48) ("[I]n each of the LG Usurious Loans (like here), LG used the conversion feature to collect consideration worth several times more than what LG actually loaned and, thus, caused the borrowing issuer to suffer thousands—*if not hundreds of thousands and even millions*—of out-of-pocket losses.").  VNUE also alleges that "LG has made more than 330 other usurious loans," in contracts governed by New York law, (*id.* ¶ 49 (emphasis omitted)), and each of these loans "are criminally usurious."  (*Id.* ¶ 22).  These 330 loans

---

order, the Second Circuit stated that "[t]hese statements in *Durante* were dicta . . . .  Our comments regarding the requirement that a RICO defendant act in 'the business of' making usurious loans were not essential to the decision," noting that *Durante* is "not and cannot be binding on this issue."  *Weiss v. David Benrimon Fine Art LLC*, No. 20-CV-3842, 2021 WL 6128437, at *2 (2d Cir. Dec. 28, 2021) (quotations omitted).  Following *Weiss*, district courts in the Circuit have taken different approaches to this requirement.  *Compare Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 376 (S.D.N.Y. 2022) (finding RICO "excludes from the definition of unlawful debt the 'occasional usurious transactions by one not in the business of loan sharking" (quoting *Durante*, 755 F.2d at 250)), *amended on other grounds by* No. 21-CV-1657, 2022 WL 2479110, at *4 (July 6, 2022), *with DarkPulse, Inc. v. EMA Fin., LLC*, No. 22-CV-45, 2023 WL 2307386, at *5 (S.D.N.Y. Mar. 1, 2023) (rejecting Defendants' argument that "allegations of occasional usurious transaction by one not in the business of loan sharking are insufficient to establish RICO liability" because this language in *Durante* was dicta (quotations omitted)).  This Court finds it unnecessary to resolve the parties' dispute on the viability of *Durante*, because even assuming the requirement applies, VNUE has alleged that LG was in the business of making usurious loans.  (*See, e.g.*, AC ¶ 50).

have been made to over 100 borrowers.  This is hardly occasional conduct.  And it is far

from minimal financially.  (*Id.* ¶ 18 (noting that LG earned profits exceeding $20

million)).  These allegations are more than sufficient to infer that LG's business is

making usurious loans.  *See*, *e.g.*, *DarkPulse*, 2023 WL 2307386, at *5 (finding the "FAC

adequately allege[d] that Defendants are in the business of lending at usurious rates"

where the FAC claimed "Defendants entered into other convertible note transactions

that are usurious under New York law and that these transactions are central to

Defendants' business").

Next, LG argues that VNUE's interest calculations are wrong as a matter of law.

In support, it contends that VNUE misunderstands the New York Court of Appeals's

decision in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (2021).  (Def. Mem. of

Law at 5–7).  But it is LG that misunderstands *Adar*.

In *Adar*, the New York Court of Appeals answered a certified question from the

Second Circuit: "[w]hether a stock conversion option that permits a lender, in its sole

discretion, to convert any outstanding balance to shares of stock at a fixed discount

should be treated as interest for the purpose of determining whether the transaction

violates N.Y. Penal Law § 190.40, the criminal usury law."  37 N.Y.3d at 323.  The Court

answered in the affirmative, finding:

> New York law requires that the value of the conversion option, like all other
> property exchanged in consideration for the loan, should be included in
> determining the loan's interest rate for purposes of the usury statutes, to the
> extent such value, when measured at the time of contracting, can be
> reasonably determined.

*Id.* at 334.  Contrary to LG's argument, the Court of Appeals stated that it "do[es] not

endorse any particular methodology" to determine the value of the stock conversion

option.  *Id.* at 339.  Perhaps more to the point, and why LG cannot prevail on a motion

to dismiss, is that *Adar* unequivocally states that the value of the conversion option is "a question of fact." *Id.* at 334. To that end, it left "the determination of appropriate valuation methods for convertible options to factfinders." *Id.* at 338. This Court could not dismiss VNUE's interest rate methodology as matter of law at this stage: "fact-specific questions cannot be resolved on the pleadings." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (alteration omitted) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)).

Despite this clear instruction, LG persists. It argues that VNUE's calculation is "a prospective computation of the lender's maximum profit on a loan," which was "specifically rejected by the Court of Appeals." (Def. Mem. of Law at 7). This argument is flawed in two respects. Again, LG misreads *Adar*. To be sure, the Court of Appeals held that "[t]he hypothetical possibility that a future exercise of a floating-price conversion option may result in a return exceeding 25% does not render a loan usurious on its face." *Adar*, 37 N.Y.3d at 334; *see also id.* at 338 (same). And while the Court noted that New York cases provide guidance on valuation, *id.* at 337, none of that guidance precludes the computation being advanced by VNUE. *E.g.*, *id.* at 338 (noting valuation "must be tailored to the risks involved in a particular investment and therefore should exclude contingencies or risks that are part of any loan transaction"). Indeed, doing so would have been inconsistent with the Court of Appeals's holding regarding valuation: "We have not been asked how to determine the value of stock conversion options here and do not endorse any particular methodology." *Id.* at 339. In fact, in giving examples of *viable* valuation methodologies, the Court of Appeals gave the example of expected future profits. *Id.* at 341 ("[A]s is the case in many commercial lawsuits, discovery reveals projections made by one or both parties as to the expected

9

profits or range of profits, . . . which might be used to construct a reasonable valuation of an investment having a contingent component."). Nothing about *Adar* precludes use of a forward-looking or prospective profits methodology.

To be sure, it would be improper under *Adar* to use hindsight to determine whether a loan was usurious when entered into. The *Adar* Court, for instance, does find in the case before it, the lender's *actual* return would not demonstrate that the loan was usurious. 37 N.Y.3d at 341 n.10 ("Although Adar Bays's actual profit on this loan cannot be used to determine that the loan was in fact usurious at the time it was entered into, a track record of grossly excessive returns could provide evidence in a future case."). So VNUE could not simply compare the $156,256.93 amount to the original $52,500.00 loan amount and use the difference ($103,756.93) as the interest earned and claim criminal usury. But that's not what VNUE is doing.

VNUE does not take actual profits (net or gross) earned by LG and use that as a basis of inferring the interest rate. Instead, it uses the percentages—which are set in the underlying Note at the time of contracting—that do not change regardless of the underlying stock price, at which LG can convert debt to shares. That is, VNUE calculates the interest by taking the discounted conversion rate agreed upon in the Note (42% discount), divides the discount by the conversion price (58%, calculated by subtracting the conversion discount (42%) from 100%). (AC ¶¶ 25–30). Then, VNUE adds the resulting percentage together with the Note's 8% annual stated interest to arrive at the alleged 80.4% interest rate. (*Id.* ¶ 31). Is it forward looking? Yes, but *Adar* does not preclude that. And is it based on hindsight profits—the sole methodology that

*Adar* prohibits?  No.[4]  Moreover, another court has approved the same method pled by VNUE in the present case.  *DarkPulse*, 2023 WL 2307386, at \*4–\*5 ("To arrive at the 73% rate, the FAC adds: the Note's stated interest rate of 8% per annum, plus an annualized interest rate of 65% resulting from the conversion option, consisting of: the original issue discount ("OID"), the difference between the principal amount of $100,000 and the purchase price of $94,000, which is $6,000 or 6%, and the value of the conversion option based on a purchase price of 70% of the value of the stock, calculated at 43% (for every 100 dollars of debt converted, EMA obtained a minimum of $143 in stock), the OID and conversion option yielding a total of 49%, then annualizing 49% from nine months (the term of the Note from its Issue Date of September 25, 2018, and its Maturity Date of June 25, 2019) to twelve months[,] for a sum of 65% for the conversion option." (footnote and quotations omitted)).

LG also offers a series of other scattershot arguments that are similarly without merit.  First, LG argues that because the remedy for a claim of usury—invalidation of the contract—would also invalidate the New York choice-of-law provision in the Note, the Court should apply Nevada law.  (Def. Mem. of Law at 8).  Nevada law, in turn, would preclude the RICO claim, because Nevada does not preclude usurious loans.  The Court finds this argument puzzling.  *But see Haymount Urgent Care PC v. GoFund Advance, LLC*, 650 F. Supp. 3d 204, 209 (S.D.N.Y. 2023).  Were the Court to apply New York law in deciding whether a usury claim had been pled, the analysis would end there.  The

---

[4] To the extent VNUE is using prior loans issued by LG (and their attendant returns) to infer this loan was usurious at the time of contracting, that is permissible. *Adar*, 37 N.Y.3d at 341 ("A final example of extrinsic evidence that could establish usury is the prior performance of similarly structured floating-price convertible loans made by a lender.  Past performance evidence is sometimes offered to determine expectancy damages in contract." (footnote omitted)).

Court would not then again do yet another choice-of-law analysis.  But in any event, VNUE has neither stated a claim for criminal usury, nor is it seeking invalidation of the Note.  The Note is simply the predicate conduct that is the basis of the RICO violations.  *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 635 F. Supp. 3d 238, 243 (S.D.N.Y. 2022) ("Congress has chosen to provide a federal cause of action that amplifies certain state-law rights by allowing plaintiffs to bring RICO claims against enterprises engaged in the collection of debts rendered unlawful by state law. 18 U.S.C. § 1962(c).  Plaintiffs sue under that federal cause of action, not under New York's usury laws.").

If VNUE is contending simply that Nevada law should apply to determine whether the Note contains a usurious rate, there is a choice-of-law question to be resolved there.  But the resolution does not proceed as LG suggests.  In fact, LG's argument is foreclosed by the very case it cites: *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020).  (Def. Mem. of Law at 8).

In *Moseley*, the Government charged the defendant with a criminal violation of the same RICO provisions at issue here: Sections 1962(c) and (d).  980 F.3d at 17 n.6.  The defendant sought to vacate his conviction, contending that the jury was erroneously instructed that New York usury laws governed the payday loans that were the predicate for the RICO charges.  *Id.* at 19.  The loans at issue contained choice-of-law provisions naming three different jurisdictions (none of which were New York).  *Id.* at 19–20 & n.10.  In deciding whether to apply those provisions, the Second Circuit applied New York's choice-of-law principles: "New York law is unambiguous in the area of express choice of law provisions in a contract.  Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State has

sufficient contacts with the transaction." *Id.* at 20 (quoting *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)).[5]  Ultimately, the Court concluded that the choice-of-law provisions were unenforceable: by directing the application of the law of three jurisdictions that did not have stringent prohibitions against usury, the provisions were void against New York public policy, which had strict bars against usury.  *Id.* at 22 ("[W]e identify a longstanding public policy in New York in favor of enforcing its usury laws to protect those of its residents who enter into consumer debt contracts.  In consumer loan contracts, choice-of-law provisions specifying foreign jurisdictions without usury laws are unenforceable in New York as against its public policy.").

The same analytical framework applies in this case, but with a different result.[6]  Again, the Court is obligated under New York law to enforce a choice-of-law provision,

---

[5] "The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005).

[6] "Where jurisdiction is based on the existence of a federal question . . . [the Second Circuit has] not hesitated to apply a federal common law choice of law analysis." *Lola v. Skadden, Arps, Slate, Meagher & Flom LLP*, 620 F. App'x 37, 42 (2d Cir. 2015) (first alteration in original) (quoting *Barkanic v. Gen. Admin. of Civ. Aviation of the People's Republic of China*, 923 F.2d 957, 961 (2d Cir.1991)).  "The federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation." *Id.* (quoting *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir.1992)).  That being said, more recent decisions have noted the uncertainty in applying federal common law choice-of-law rules, regardless of the basis for subject matter jurisdiction, opting instead to apply the law of the forum state. *E.g.*, *Mayagüez S.A. v. Citibank, N.A.*, No. 16-CV-6788, 2022 WL 3586482, at *5–*6 (S.D.N.Y. Aug. 21, 2022) (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 170 n.5 (2d Cir. 2015)).  Under either approach, the result is the same.  Federal common law choice-of-law analysis—emphasizing the state with the greatest interest—leads to the application of New York choice-of-law rules.  New York is the state with the greatest interest here, notwithstanding VNUE's connections to Nevada, because LG is located here, and the Note indicates the contract is deemed to have been performed in New York.  (Note ¶ 15).  Under the other, the forum state analysis, New York is the forum state, and its choice-of-law rule govern.

absent a countervailing public policy (or a lack of connection between the parties and New York). Here, the Note's choice-of-law provision elects New York as the governing state law. This Court can apply that election without the public policy bar present in *Moseley*, since application of New York law effectuates rather than abrogates the state's public policy against usurious contracts. Nor is there an absence of connection to New York: LG itself is headquartered here, (AC ¶ 3), and the Note itself states that the transaction is deemed to have been performed in New York. (Note ¶ 15).[7]

The Court respectfully recommends Defendant's motion to dismiss VNUE'S RICO claims be denied.

II.    Unjust Enrichment Claim

LG devotes only one line to VNUE's unjust enrichment claim. LG argues, "to the extent that the unjust enrichment claim is based on New York law, it too must fail because it is really a prohibited claim premised on usury." (Def. Mem. of Law at 14–15). LG then argues in reply that VNUE's unjust enrichment claim is "an end run" around the lack of a civil cause of action for usury under New York state law. (Reply Mem. of Law in Further Supp. of Mot. to Dismiss dated May 3, 2023, Dkt. No. 29 at 7).

---

[7] LG's final argument is also meritless. It contends that "criminal usury cannot form the basis for a civil RICO claim under New York law because that body of law does not afford any affirmative remedy for usury but rather treats the transaction as void *ab initio*." (Def. Mem. of Law at 11). No courts have taken this position. Plaintiffs routinely bring RICO claims with New York usury law serving as the predicate. *See, e.g.*, *Durante Bros.*, 755 F.2d at 245 (finding Plaintiff stated a RICO claim using New York usury law as predicate); *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 463 (S.D.N.Y. 2022) (finding Plaintiffs adequately pled that loans with interest rates twice the New York criminal usury rate are "unlawful debts under the RICO statute." (quotations omitted)). And indeed, the Second Circuit's decision in *Moseley* disposes of the argument, by recognizing the use of the New York usury statute in the way advanced here (albeit in a criminal case).

No cases or doctrine support LG's position.  To state a claim for unjust enrichment under New York law, "a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quotations omitted).  VNUE alleges that "Defendants have received valuable benefits from VNUE," including "the stock and profits realized from the acquisition and—upon information and belief— subsequent sale of the unlawfully issued and/or delivered shares of VNUE common stock."  (AC ¶ 107).  There is no prohibition on bringing an unjust enrichment claim alongside one for RICO violations, even though the latter is based on the existence of a contract and the former presumes the lack of one (though at a later stage, the Court would have to address the potential for double recovery).  *See R.B. Dev., Co. v. Tutis Cap. LLC*, No. 12-CV-1460, 2013 WL 12358006, at *18 (E.D.N.Y. Sept. 27, 2013) ("At the pleading stage, [a plaintiff is] permitted to assert claims in the alternative and is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims." (quotations omitted)) (collecting cases).  And while criminal usury is a defense that voids a contract, that posture does not preclude a plaintiff from seeking to recoup unjust proceeds received by a defendant.  That is, equitable remedies like unjust enrichment do not disappear because the contract (and legal claims) between parties vanish.  *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 389 (S.D.N.Y. 2004) ("Even where these contracts have been 'terminated' through completion of performance or the action of one party, restitution continues to be available as a remedy to a wronged party."); *see also Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 433 (2d Cir. 1995).  But in any event, this argument is like many of those advanced

by LG.  It assumes that VNUE is bringing an affirmative usury claim or seeking to void the Note on such grounds.  It is not.

Accordingly, the Court respectfully recommends that LG's motion to dismiss the unjust enrichment claim be denied.

<u>CONCLUSION</u>

For the reasons stated above, it is respectfully recommended that Defendants' motion to dismiss be denied.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of service of this report.  Failure to file objections within the specified time may waive the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate[] [judge's] report operates as a waiver of any further judicial review of the magistrate[] [judge's] decision." (quotations omitted)).


SO ORDERED.

*/s/ Sanket J. Bulsara*  January 12, 2024
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York